NO. 07-05-0135-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

MAY 18, 2006

_____

FIRST PERMIAN, L.L.C. AND
ENERGEN RESOURCES COMPANY, APPELLANTS

V.

JAMES P. GRAHAM, APPELLEE

_____

FROM THE 286TH DISTRICT COURT OF COCHRAN COUNTY;

NO. 02-12-3789; HONORABLE HAROLD PHELAN, JUDGE

_____

Before REAVIS and CAMPBELL and HANCOCK, JJ.

**OPINION**

Appellants, First Permian, L.L.C., and Energen Resources Company, appeal the trial court's entry of judgment nothwithstanding the verdict in favor of appellee, James P. Graham. We reverse and render.

Factual Background

In 1963, J. Frank Graham, Sr., J. Frank Graham, Jr., Robert S. Graham, Betty Jo Graham Finn, and Mary Jane Graham Robertson (Grahams) assigned 100 percent of their interest in certain oil and gas leases located in Cochran County, Texas to Pan American Petroleum Corporation (Pan American). The assignment provided for an immediate payment of $100,000 by Pan American to the Grahams, the receipt of which was acknowledged. Additional terms of the assignment, which are important to the discussion herein include:

- Paragraph 2-Reserved to the Grahams a production payment of $400,000 plus 5½ percent interest per annum, calculated monthly on the decreasing balance.
- Paragraph 2(f)-Upon full payment of the production payment reserved to the Grahams, the interest reserved was to cease and terminate and, *ipso facto,* vest in Pan American.
- Paragraph 5-Subject to the rights previously reserved in the assignment, the reservation to the Grahams of a preferential right to match any bona fide offer to purchase the leases accepted by Pan American.
- Paragraph 9-Terms of the assignment bound the heirs, successors or assignees of both the Grahams and Pan American.

In 1967, the leases involved herein were unitized as part of the Whiteface unit. The Grahams ratified the formation of the unit. The production payment called for in paragraph 2 of the assignment was paid out in 1975.

Subsequently, there were a series of assignments of the interest initially held by Pan American. Ultimately, First Permian, L.L.C. (First Permian), obtained the interests. Notice of each of these assignments was given to the Grahams pursuant to the preferential right

they retained in Paragraph 5 of the original assignment. First Permian offered its assets for sale to prospective bidders in 2002. The assets contained the leases originally held by the Grahams. Notices were sent to all holders of preferential rights in all of the First Permian's assets, including the Grahams. Appellee, James P. Graham (James), is the son of Robert S. Graham. After receiving First Permian's notice of proposed sale of the leases, James sent a letter to First Permian on April 2, 2002, informing First Permian that he was considering exercising his preferential right, but needed additional information from First Permian.

Ultimately, the bid of Energen Resources Company (Energen) was determined to be the winning bid. Energen's purchase of First Permian's assets was completed on April 8, 2002. On April 10, 2002, Energen's title attorney sent a letter to James advising him that he had concluded that the preferential right held by the Grahams, resulting from the assignment of 1963, had expired with the final payout of the production payment in 1975. On this basis the letter purported to revoke any notice of preferential right to purchase previously sent to him. James then filed this lawsuit.

Procedural Background

James filed suit against both First Permian and Energen. As to First Permian, James alleged breach of contract, specifically alleging that First Permian failed to abide by the terms of the preferential right paragraph of the 1963 assignment. As to Energen, James alleged that they tortiously-interfered with James's preferential right and were, therefore, liable for damages. James requested relief by specific performance enforcing

3

his preferential right to purchase the leases involved and for damages for the oil removed from the lease properties since the sale to Energen. First Permian and Energen counterclaimed seeking a declaratory judgment that the Grahams' preferential right expired when the production payment was paid out. First Permian and Energen also moved for summary judgment claiming that the preferential right ceased, as a matter of law, when the production payment was completed. The trial court denied the motion.

The case proceeded to trial. At the close of James's case in chief, the trial court granted Energen's directed verdict as to James's tortious-interference claim. At the close of trial, the jury answered all submitted fact questions adverse to James. James filed a motion for judgment notwithstanding the verdict alleging, that as a matter of law, First Permian had breached the preferential right provision of the assignment. The trial court granted James's motion and entered judgment against both First Permian and Energen, ordering that they convey the leases in question to James. Further, the court ordered that James recover the profits realized from the property since the sale to Energen, pre and post judgment interest, attorneys fees and cost of court. It is from this judgment that First Permian and Energen appeal.

First Permian and Energen present five issues on appeal. Four of the five deal with the preferential right contained in paragraph 5 of the 1963 assignment. The fifth issue deals with the award of damages and equitable relief, against Energen, after the directed verdict against James on his tortious-interference claim. The first issue, as presented by First Permian and Energen in their motions for summary judgment and directed verdict, claims that the preferential right involved herein was a covenant that ran with the land and,

4

as such, the right terminated when the Grahams' interest in the land ceased. We agree with First Permian and Energen and, therefore, will reverse.

Preferential Rights

All parties to this appeal agree that the 1963 assignment of the Grahams' lease interest contained a preferential right for the Grahams' to match any bona fide offer that the assignee, Pan American, accepted. The assignment also identified the notification required to be given to the Grahams. Likewise, all parties to this appeal agree that the preferential right created by the assignment is in the nature of a covenant that runs with the land. Additionally, all parties agree that the assignment provided for a production payment to the Grahams until the sum of $400,000 plus interest, at the rate of five and one-half (5 ½) percent per annum on the unpaid balance, was fully paid. Finally, there is no disagreement that the 1963 assignment contained a paragraph making the terms of the assignment binding upon and inuring to the benefit of the respective heirs, successors, and assigns of both the assignor and assignee. The disagreement is about the proper interpretation to be given these respective paragraphs in the 1963 assignment.

James points out that paragraph 5, the preferential right paragraph, does not contain any provision terminating the preferential right upon completion of the production payment. Further James argues that paragraph 2, the production payment paragraph, contains no clause specifically connecting the preferential right and the production payment. Additionally, James points to the fact that the assignment contains, in Paragraph 9, a provision that the obligations and rights created by the assignment would be binding on and

5

inure to the benefit of the heirs, survivors, and assignees of either party to the assignment. Interpreting these provisions together, James contends that the preferential right is a separate and independent covenant that was not terminated by pay out of the production payment.

Our first task is to construe the contract in light of the record before us. An appellate court reviews a trial court's construction of a contract *de novo*. Security Savings Ass'n v. Clifton, 755 S.W.2d 925, 931 (Tex.App.–Dallas 1988, no writ). A court must interpret a contract based upon the true intentions of the parties. SAS Institute, Inc. v. Breitenfeld, 167 S.W.3d 840, 841 (Tex. 2005). No single provision taken alone will be given controlling effect; rather, all provisions must be considered with reference to the whole instrument. Id.

Applying our rules for construction of a contract to the facts before us, the following becomes clear:

1. The total purchase price of the Grahams' leases was $500,000, of which $100,000 was paid at the time of the assignment's execution;

2. The balance of the cost of the leases, $400,000 was financed at the rate of five and one-half (5 ½ ) percent per annum on the unpaid balance;

3. The production payment was to pay for the financed portion of the purchase price of the leases;

4. When the $400,000 plus interest was paid, the interest reserved by the Grahams would terminate and the same would vest in Pan American.

Considering the assignment as a whole and giving effect to all of its provisions, the interpretation urged by James must be rejected. Rather than creating an independent preferential right for the Grahams' heirs, successors, and assigns to enjoy forever, the

6

preferential right was intended to exist only so long as necessary to protect the interest of the Grahams, their heirs, successors, or assigns in the full payment for the leases. This is the only construction that gives full meaning to all of the provisions of the assignment. Id.

Having determined that the preferential right was tied to the production payment, the next issue becomes what effect the completion of the production payment would have on the preferential right according to the assignment. To understand this the nature of a preferential right must be ascertained. All parties agree that the preferential right involved in this case is a real covenant. As such the preferential "right runs with land" if it touches and concerns the land; relates to a thing in existence or specifically binds the parties and their assigns; is intended by the original parties to run with the land; and when the successor to the burden has notice. Inwood North Homeowners Ass'n, Inc. v. Harris, 736 S.W.2d 632, 635 (Tex. 1987). By contrast, personal covenants bind only the actual parties to the covenant and those who purchase the land with notice of the restrictive covenant, if the restrictions concern land or its use. Tarrant Appraisal Dist. v. Colonial Country Club, 767 S.W.2d 230, 235 (Tex.App.–Fort Worth 1989, writ denied).

As a real covenant, the preferential right is subject to Texas law governing real covenants. First, a real covenant endures only so long as the interest in land to which it is appended. Talley v. Howsley, 170 S.W.2d 240, 243 (Tex.Civ.App.–Eastland 1943), aff'd, 176 S.W.2d 158 (Tex. 1943). Second, a real covenant can only be enforced by the owners of the land the covenant was intended to benefit. Davis v. Skipper, 125 Tex. 369, 83 S.W.2d 318, 321 (1935).

7

James contends that McMillan v. Dooley, 144 S.W.3d 159 (Tex.App.–Eastland 2004, pet. denied), has changed this requirement. However, the facts of the McMillan case are significantly distinguishable from the present case. The court in McMillan concluded that the covenant was a real covenant. However, upon closer examination, the McMillan covenant had significantly more of the characteristics of a personal covenant. The facts of McMillan show that the parties, at the time of execution of the agreement in question, did not intend that Johnson would be required to have an interest in the land to support the enforcement of his preferential right. Rather, the parties intended that Johnson have a personal right to enforce the covenant. Therefore, the covenant in McMillan does not possess all four of the requirements of a covenant running with the land, but rather constituted a personal covenant. See Inwood, 736 S.W.2d at 635. This is the only Texas case cited by James that supports the proposition that a real covenant that runs with the land can be enforced by a party that does not have an existing interest in the land the covenant was created to benefit. James cites the court to Sanchez v. Dickinson, 551 S.W.2d 481, 485 (Tex.App.–San Antonio 1977, no writ), for the proposition that a preferential right is a covenant running with the land. This is a true statement, as agreed by all parties to this litigation, however, in Sanchez, the party attempting to enforce the covenant was the owner of an interest in the land. Dickinson still owned the original 791.21 acre tract the covenant was intended to benefit. Likewise, in the case of Stone v. Tigner, 165 S.W.2d 124, 127 (Tex.Civ.App.–Galveston 1942, writ ref'd), the holder of a right of first refusal was allowed to enforce his right of first refusal to purchase the land in question because he owned a valid lease in the land. James also cites this court to Westland Oil Development Corp. v. Gulf Oil Corp., 637 S.W.2d 903 (Tex. 1982), for the proposition that

a covenant can run with the land based simply on a burden on the covenantor's land that renders the land less valuable. This is a true statement, but in addition to that, the party seeking to enforce the covenant, Westland, still retained an interest, a 1/16 of 8/8 overriding royalty interest, in lands earned pursuant to the farmout agreement. Id. at 905. Accordingly, we do not find the McMillan case controlling in the present fact situation.

When this body of law is applied to the facts before us, it is apparent that James did not have a current interest in the estate to which the preferential right would have appended. The rights his predecessors in interest, the Grahams, held were terminated with the payment of the final production payment in 1975. Accordingly, as a matter of law, James had no preferential rights to the property subject to the 1963 assignment of lease.

Conclusion

Having determined that James had no preferential right, we reverse the judgment of the trial court and, pursuant to Texas Rule of Appellate Procedure 43.3, enter the judgment that the trial court should have rendered. Therefore, we render judgment that James take nothing by his suit. As our resolution of the First Permian's and Energen's first issue is all that is necessary to dispose of this appeal, we will not address the other issues raised. See TEX. R. APP. P. 47.1.


Mackey K. Hancock
Justice


9